1428

Eddie Wayne ELDRIDGE, Charles Louis Beaudrot, Russie Beaudrot Young, Homer Charles Walker and Ray F. Stewart, Individually and on behalf of a Class of Plaintiffs similarly situated, and Herbert Malcolm Crum, Individually and on behalf of a Class of Plaintiffs similarly situated, Appellants v. The CITY OF GREENWOOD, Greenwood County, and the South Carolina Highway Department, Respondents.

(388 S. E. (2d) 247)

Court of Appeals

GOOLSBY, J., concurred and filed opinion.

GARDNER, J., dissented and filed opinion.

*J. Kendall Few, Marvin R. Watson,* Greenwood, and *Thomas E. Hite, Jr.,* of *Hite & Pruitt,* Abbeville, *for appellants.*

*W. K. Charles, III, Stephen D. Baggett,* of *Burns, McDonald, Bradford, Patrick & Dean,* and *Watson L. Dorn,* of *Callison, Dorn, Thomason & Garrett,* Greenwood, *Deputy Chief Counsel Richard D. Bybee,* and *Asst. Chief Counsel William L. Todd,* of *S.C. Dept. of Highways and Public Transportation,* Columbia, *for respondents.*

Heard May 16, 1989.

Decided Dec. 11, 1989.

CURETON, Judge:

This case concerns the vacated right-of-way of Southern Railway in the City of Greenwood, South Carolina. The Appellants are members of two classes. One class is composed of abutting landowners along the right-of-way. The

second class consists of heirs of the original owners of the right-of-way property at the time the right-of-way was acquired. They collectively allege that under Act. No. 2953 of 1845, which authorized the acquisition of the right-of-way by Southern Railway's predecessor in title, the area encompassed by the right-of-way reverts to them upon the removal of the railroad tracks. The record indicates the predecessor to Southern Railway obtained title to the right-of-way under the 1845 statute by either fee simple deed, condemnation, or statutory grant. The record does not disclose the size of the two classes or the property owned by the members. The two classes have not been certified. The record also does not disclose the specific method by which the railroad obtained the right-of-way through the property of each class member. The parties agree various portions of the disputed five and one-half mile right-of-way were obtained by each of the three methods provided by statute (i.e. fee simple deed, condemnation and statutory grant).

The history of how the railroad's right-of-way came into existence, its development, and the final decline in its use are detailed in the trial court's order:

> The Act of 1845 provided for the formation of the Greenville and Columbia Railroad Company to construct a railroad from "the town of Columbia to the town of Greenville, passing through the villages of Newberry and Laurens." The hamlets and towns in the Abbeville District (now Greenwood, Abbeville and Anderson Counties) greatly desired that the Greenville and Columbia Railroad cross the Saluda River and serve the northwestern part of South Carolina. Railway service was all important to the development of commerce and industry. Therefore, there were many rallies and meetings to generate public support and to raise money or capital to pay for the cost of bringing the railroad across the Saluda River and to serve the Abbeville district and to provide a vital rail link to the major cities and towns of South Carolina.
>
> The leaders and citizens of the Abbeville District were successful and the Greenville and Columbia Railroad crossed the Saluda River near Chappels in 1852 and served the hamlets, towns and communities of the

Abbeville District. As a result, the little hamlet or town of Greenwood moved from near New Market and Cambridge Streets and laid out a new public square with adjoining streets and roads, on each side of the new Greenville and Columbia Railroad. Roads, streets and later, highways, were located along the said railroad, within the railroad right-of-way, for railroad purposes, to provide public access to the railroad passenger and freight depots and to provide public access to the commercial, industrial and residential establishments located along the railroad. In other words, the whole town of Greenwood grew up and developed along the railroad and the roads, streets and highways were located along side the railroad for railroad purposes and to provide the necessary public access to the railroad. Greenwood went on to become the railroad capital of western South Carolina with five (5) separate railroads. Southern Railway Company later acquired the Greenville and Columbia Railroad. See, *Southern Railway v. Beaudrot*, 63 S. C. 266, 41 S. E. 299 (1902).

With the invention and development of the automobile, the transportation needs of the public underwent a rapid change. Transportation and conveyance of passengers and freight by automobiles, buses and trucks soon rivaled that of the railroads. Passenger service by Southern (formerly Greenville and Columbia Railroad) was discontinued, the passenger depot was removed from the center of Greenwood, the C & W C moved its freight depot out of town, the Southern moved its freight depot to South Greenwood, the C & W C railroad removed its tracks from the center of Greenwood, all spur lines servicing commerce and industry were discontinued, and finally, the only thing left through the center of Greenwood was a single main track of the Southern Railroad.

In the 1970s a federal program was implemented to provide for the relocation of the railway tracks from the downtown area to the outskirts of the city. Under this program, the City of Greenwood and Greenwood County acquired the necessary land for the relocation of the tracks by condemnation. The City and County then deeded the acquired property

to Southern Railway in exchange for its quitclaim deed to them of its interest in the right-of-way now in dispute. These conveyances occurred in 1984. The Statement of the Case provides "[a] typical section of the right-of-way at the time of relocation consisted of two parallel roads on either side of the vacated track with an unpaved section varying from 25 to 60 feet lying between these two paved roadways."

The appellants contend the removal of the railroad tracks and the conveyance of the right-of-way to the City and County of Greenwood constituted a breach of the conditions of the 1845 Act resulting in a reversion to them of title to the subject property. The pertinent provision of the 1845 Act provides:

> XI. That in the absence of any written contract between the said Company and the owner or owners of land, through which the said Railroad may be constructed, in relation to said land, it shall be presumed that the land upon which the said Railroad may be constructed, together with one hundred feet on each side of the center of said road, has been granted to the said Company by the owner or owners thereof, and the said Company shall have good right and title to the same (and shall have, hold and enjoy the same) unto them and their successors, *so long as the same may be used only for the purposes of said road and no longer* (emphasis added) . . . .[1]

The Respondents, City of Greenwood, Greenwood County, and the South Carolina Highway Department deny any

---

[1] No one disputes the railroad company acquired an easement under the Section XI provision. *See Southern Ry. v. Beaudrot*, 63 S. C. 266, 41 S.E. 299 (1902); *Ragsdale v. Southern Ry.*, 60 S. C. 381, 38 S. E. 609 (1901). There is serious doubt in our mind, however, whether Southern Railway could convey its easement since the section uses only the word "successor" and fails to use the word "assigns" in its granting provisions. *See Matthews v. Seaboard Air Line Ry.*, 67 S. C. 499, 46 S. E. 335 (1903) (railroad cannot grant its right-of-way so as to defeat the purpose for which it was acquired); *Schmoele v. Atlantic City R. Co.*, 110 N. J. Eq. 597, 160 A. 524 (1932) (term successor as applies to railroad corporations ordinarily means corporate successor, and not independent corporation buying property); 65 Am. Jur. (2d) *Railroads* Section 48 (1972) (a railroad acquiring only an easement in land for a right-of-way cannot sell such right-of-way apart from its franchise.) This issue is not before us.

claim of the appellants to the disputed property. They filed a motion for summary judgment claiming the facts are not in dispute regarding whether the actions of the railroad company amounted to a breach of the conditions of the grant. The trial court granted summary judgment ruling only questions of law were involved. The order held the removal of the railroad tracks and the exchange of rights-of-way did not constitute an abandonment by the railroad of the property for railroad purposes and the disputed property had simply undergone a permitted change in use. The principal issue in this case is whether the removal of the railroad tracks and the conveyance of the right-of-way to the City and County of Greenwood constituted an abandonment of the use of the right-of-way "for purposes of the said [rail]road." Section XI of Act No. 2953, 1845 *S. C. Acts* 348.

I.

The trial court found the obvious intent of the 1845 Act was to provide for the conveyance or transportation of persons, merchandise, and produce over a railroad to serve the public need. The court then reasoned that the purpose of the transfer of the right-of-way to the City and County was to effectuate the acquisition of new property which would enable the railroad to serve the public need in a more economical, less hazardous, and more efficient manner, then the right-of-way continued to be used for railroad purposes. We think the trial judge recognized, as we do, that the issue is not whether there has been a failure to use the right-of-way for public purposes, but whether or not the right-of-way is now being used for the purposes of the railroad.

At first glance, it would seem that since the railroad company is not using the easement property at all it cannot be asserted the disputed property is being used for railroad purposes. Ownership of a right-of-way by a railroad company carries with it the right to use the property within the right-of-way for any purpose which furthers the business of the railroad. *Sparrow v. Dixie Leaf Tobacco Co.*, 232 N. C. 589, 61 S. E. (2d) 700 (1950). When land is taken for railroad purposes, the railroad company acquires "not merely the right to construct and maintain a railroad in

accordance with the original plans, but it is the easement to make any use of the land for railroad purposes that the public necessity and convenience may from time to time require." 3 *Nichols on Eminent Domain* Section 11.11 (3d ed. 1985). So long as the use to which the right-of-way is put comes within these rules, the owner of the servient estate has no cause to complain. *Sparrow*, 232 N. C. 589, 61 S. E (2d) 700. But, while a "railroad company may deal with the right-of-way so acquired as its own in the conduct of its business as a carrier, *it cannot dispose of it or use it so as to destroy or impair its ability to serve the public." Matthews v. Seaboard Air Line Ry.*, 67 S. C. 499, 505, 46 S. E. 335, 336 (1903) (emphasis added).

In the case of *Cayce Land Co. v. Guignard*, 135 S. C. 446, 134 S. E. 1 (1926) one of the issues was whether Southern Railway Company exceeded its authority in its right-of-way by permitting a spur track of Seaboard Railway Company to pass under Southern's track. The Seaboard spur track did not connect with Southern. The court held as follows:

> There appears to be no connection at the underpass or elsewhere between the Seaboard spur track and the Southern railway. The Seaboard spur track was, therefore, constructed solely for its benefit and under its authority for its railroad purposes. The Southern had no more authority to permit the use of its right-of-way for the benefit solely of the Seaboard than it had for the benefit solely of an independent industry which brought no revenue to it.

*Cayce Land Co.*, 135 S. C. at 550, 134 S. E. at 34.

A principle emanating from the cases is that a railroad company may only acquire property under authority of a statute or its charter and for purposes stated in its charter. 65 Am. Jur. 2d *Railroads* Section 47 (1972). A railroad company takes property for public use on condition that it be used only for the purposes set forth in its charter. *Greenville & Columbia R.R. Co. v. Partlow*, 40 S. C. L. 286, 287 (1853) ("By the Act chartering this company ... the company is authorized to take any land, that may be required by it in the execution of the purposes for which it was chartered").

We have been unable to locate a South Carolina case with similar facts. Additionally, many of the cases cited by the parties dealing with the question of whether public roads may be constructed within railroad rights-of-way are limited in applicability because the easements, unlike the one in question, continue to be physically used for the operation of the railroad tracks. Thus the real question in those cases is whether the construction of the roads amounted to an additional servitude for which compensation must be paid to the owner of the fee.

The question of whether a railroad has abandoned its right-of-way is ordinarily a question of fact. *Lorick & Lowrance, Inc. v. Southern Ry. Co.*, 87 S. C. 71, 68 S. E. 931 (1910). In *Lorick &. Lowrance* the court said that in order to destroy the rights of the railroad to a right-of-way under a statute similar to the one in this case "there must be shown either a use separate and distinct from railroad purposes or nonuse for railroad purposes under such circumstances as to indicate an intention to abandon the right-of-way," *Id.* at 74, 68 S. E. at 931. The doctrine of abandonment as it relates to railroads is stated in the case of *Raleigh, C. & S. Ry. Co. v. McGuire*, 171 N. C. 277, 280, 88 S. E. 337, 339 (1916):

> It includes both the intention to abandon and the external act by which such intention is carried into effect. There must be a concurrence of the intention with the actual relinquishment of the property. It is well settled that to constitute an abandonment or renunciation of a claim to property there must be acts and conduct, positive, unequivocal and inconsistent with the claims of title.

In *Raleigh* the Supreme Court of North Carolina found no abandonment where the railroad company relocated its main tracks to another location, but continued to use the disputed right-of-way for a spur track. However, evidence of a railroad's intention to abandon a right-of-way "has often been found in the deliberate removal of tracks or other facilities from the land whereby the running of trains is rendered impossible." 65 Am. Jur. (2d) *Railroads* Section 83 at 392 (1972): *See Boyd v. Pierce*, 278 Ark. 161, 644 S. W. (2d)

927 (1983) (removal of railway station and tracks); *People ex rel. Carson v. Mateyka*, 57 Ill. App. (3d) 991, 15 Ill. Dec. 125, 373 N. E. (2d) 471 (1978) (removal of tracks and signal wire); *L. & G. Realty and Constr. Co. v. City of Indianapolis*, 127 Ind. App. 315, 139 N. E. (2d) 580 (1957) (adandonment of electric interurban services). Additionally, an intent to abandon has been found in a railroad conveying its right-of-way to another for purposes other than a railroad. *Anno.*, 95 A.L.R. (2d) 468, 498 (1964).

■ Clearly, the purpose of the grant of the right-of-way was to permit the construction and operation of a railroad as railroads were commonly known in 1845. It is clear from a reading of the 1845 Act[2] and older cases that the General Assembly knew the difference between a railroad and a common highway in 1845. *See L.C. & C.R.R. Company v. Chappell*, 24 S.C.L. 383 (1838) (the court compared the right of the legislature to franchise a private corporation to acquire private property to construct and operate a railroad to the right it had been granting for years to private corporations to acquire property to operate public highways). We are not unaware of language in that opinion which appears to equate railroads to highways. However, as we read *Chappell*, the court equated a railroad to a common public highway only to demonstrate that both were conduits for the transportation of people and freight and therefore they both served the public interest. Thus a statute authorizing the establishment of the railroad and granting it the right of eminent domain was not constitutionally infirm on the ground the statute authorized the taking of private property for private use. We read the case to say a railroad company may open and operate public highways in furtherance of its corporate charter only to the extent necessary to facilitate the use, maintenance, and operation of its railroad business.

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. S.C.R. Civ. P. 56(c). Summary judgment is not appropriate where further in-

---

[2] The Act refers to turnpike (toll) roads and provides for additional grants to construct roads within the railroad's right-of-way.

quiry into the facts of the case is desirable to clarify the application of the law. *Bowen v. U. S. Capital Corp.*, 295 S. C. 201, 367 S. E. (2d) 474 (Ct. App. 1988); *Smith v. S. C. Dept. of Highways and Public Transp.*, 296 S. C. 11, 370 S. E. (2d) 101 (Ct. App. 1988).

The record does not reveal how the operation of public roads (even on those portions of the right-of-way that contain roads) by the respondents within the disputed right-of-way is incident to the construction, maintenance, and operation of Southern Railway's railroad. We, therefore, hold the trial judge erred in holding as a matter of law that Southern Railway in removing its tracks and purporting to deed the right-of-way to the City of Greenwood and Greenwood County did not abandon the right-of-way.

Even if we were to hold as a matter of law that the use of the right-of-way for public highway purposes satisfies the condition of the grant requiring the easement to be used only for railroad purposes, we nevertheless find summary judgment inappropriate. The record raises factual questions of how the disputed right-of-way has been developed or utilized over the years. Portions of the area seem to have been utilized for highway purposes while other portions appear not to be presently used for public highways. Additionally, factual questions exist concerning what portions of the property were acquired by fee simple title and what portions were acquired by easement.

While summary judgment is a viable pretrial device for resolution of many cases, it does not appear to be a viable alternative for resolution of this case. A case with as much undeveloped factual detail as indicated by this record merits further consideration of the issues on a more complete record.

## II.

Section 24 of Act No. 2953 reserved unto the Legislature the right to "make further grants of ferries, bridges, and turnpike roads, within any distance of the [railroad], whenever the convenience of the community may require such further grants." The trial court reasoned this section "provided for roads, streets and highways within any distance of the railroad." It therefore held this

section allowed the use of the vacated railroad right-of-way for highway purposes and such use did not trigger a reversionary interest or constitute an abandonment of the subject easement by the railroad company.

The appellants argue there have been no further grants by the Legislature of the right to construct highways within the railroad company's right-of-way. Thus, they assert the section is inapplicable to this suit. On the other hand, the respondents argue the Legislature has effectively made such grants by generally delegating to the South Carolina Department of Highways and Public Transportation (Department) the right to acquire land for highway purposes. They further argue that pursuant to that delegation, the Department has "entered into contracts and agreements with the Railroad and the City and County and Federal governments to exercise and implement that power through the elimination of rail-highway grade crossings and the construction of widening projects in and near the vicinity of Greenwood, South Carolina." The Department then cites numerous statutes granting to the Department the right to do certain acts. None of these statutes vest any title to the right-of-way in the Department, nor do they bestow upon the Department the right to possess or occupy the right-of-way.

We view Section 24 of Act No. 2953 as further restricting the railroad company's use of the right-of-way granted to it. Simply stated Section 24 provides that while the General Assembly has granted to the railroad company the right to construct a railroad track and operate a railroad over the subject property, the Legislature reserved the authority to grant to others the right to construct and operate ferries, bridges, and turnpike roads within the right-of-way granted to the railroad company. Thus, because the railroad company has a "mere easement in the land, [its] right of possession is not exclusive, except so far as the land covered by the right of way is actually needed for the purpose of constructing, operating or maintaining the railroad." *Southern Ry. v. Beaudrot*, 63 S. C. at 269, 41 S. E. 299.

Because there has been no legislative grant to the municipalities or the Department of a right-of-way for any purpose the trial court erred in construing Section 24 to grant to the appellants the right to use the easement property for high-

way purposes irrespective of whether or not the disputed property is also being used for railroad purposes.

We reverse and remand this case for further factual development on the merits. We note the respondents raised various other defenses in their pleadings which were not addressed on summary judgment. We express no opinion on those matters.

Reversed and remanded.

GOOLSBY, J., concurs in separate opinion, and GARDNER, J., dissents in separate opinion.

GOOLSBY, Judge (concurring):

I concur fully in Judge Cureton's opinion. I think it appropriate, however, to comment briefly on Part I of Judge Gardner's dissent.

In Part I of his dissent, Judge Gardner indicates he would uphold the trial court's grant of summary judgment using the doctrine of "condemnation by substitution." Under this theory, a municipality may constitutionally condemn specific property and exchange it for other property acquired for public purposes. *See* Annot., 20 A.L.R. (3d) 862 (1968).

The issue here is not whether the City of Greenwood had the right to condemn property for the relocation of the railroad and exchange it for the right-of-way in question; rather, the issue is whether the City of Greenwood obtained a greater title to the right-of-way than Southern Railway had simply by exchanging other property for it.

I do not think that the doctrine of substitute condemnation can be used by the City of Greenwood to confer upon it a greater interest or title in property than the railroad itself had unless in the exchange the city also pays fair compensation therefor to each person holding a reversionary interest in the property.

I respectfully dissent. I would hold for three separate and distinct reasons that the order of the learned trial judge should be affirmed. While I concur in the analysis of the trial judge, I, for other reasons based upon the record before me, am convinced that the appealed order should be affirmed.

I.

Although the issue is novel in South Carolina, it is well settled in courts of other jurisdictions that where, in furtherance of a public purpose, a body politic is authorized to condemn land, it may condemn other property and exchange it for that needed to accomplish such purpose. This doctrine, known as "compensation by substitution," has been applied in highway re-routing cases by numerous courts. *See Herr v. City of St. Petersburg*, 114 So. (2d) 171, 174 (1959) and the many cases cited therein for this proposition. The court in *Herr* noted that the transaction before it amounted to an equal exchange of properties between the City and the railroad, both having the power of eminent domain; the exact same situation this court is faced with and in this connection cited the doctrine of "compensation by substitution." *Id.* at 174. The reader is also referred to 20 A.L.R. (3d) 862 and the annotation therein entitled, "Substitute Condemnation: Power To Condemn Property Or Interest Therein To Replace Other Property Taken For Public Use," Section 3. The doctrines of "compensation by substitution" and "substitute condemnation" have been applied to factual situations similar to the case before us. We, however, do not find a case where either of these doctrines has been applied to the exact same factual situation with which we are faced. In my mind, however, the logic supporting these two doctrines applies to the case before us.

Our Supreme Court in the case of *Sadler v. Lyle*, 254 S. C. 535, 176 S. E. (2d) 290 (1970) approved the exchange of land and relocation of a railroad track where the public safety and welfare were at stake; there the Supreme Court stated "the fact—that the proposed transaction involves an exchange of property between the city and Southern [Railroad] does not exceed the authority of the city nor *violate any public policy.*" [Emphasis mine.]

I would hold that the railroad, under the situation of this case, had the right to convey its easement to the City in lieu of condemnation. Common sense dictates this proposition. If the railroad had a right, as it did, to relocate its line and to condemn property for that purpose,[1] and the City had a

---

[1] *See* Sections 58-17-1190 and 58-17-1200, Code of Laws of South Carolina (1976) as amended in 1987.

right, as it did, to condemn the railroad's right-of-way for the purpose of building a highway or road,[2] then the City and the railroad company had the right to agree to the exchange of right-of-ways as they did in lieu of condemnation. The state and its political subdivisions have a fundamental fiscal interest in providing for an efficient means of effecting acquisitions of property for public purposes[3] and this fundamental interest dictates, in my opinion, the approval by this court of the exchange of right-of-ways between the City and the railroad in order to avoid unnecessary expenses in terms of litigation expenses and otherwise which are incident to condemnation procedures.

The Supreme Court of our state in the case of *Matthews v. Seaboard Air Line Ry.*, 67 S. C. 499, 46 S. E. 335 (1903) rendered an opinion which, in logic, supports the validity of the railroad's conveyance of the subject property to the City and County of Greenwood. There, after dealing with the right of condemnation of railroad right-of-ways as provided by Section 58-15-1350,[4] then Civil Code in 1902, Section 2195, the Supreme Court had this to say:

> When conditions arise that would justify the condemnation of a way over a railroad right of way, **the railroad company no doubt could, without violating its duty to the public, waive condemnation, and allow the easement over its own right of way** .... [Emphasis mine.]

67 S. C. at 506, 46 S. E. at 337.

There is no doubt but what conditions arose that would justify the condemnation of a way over the railroad right-of-way. And these conditions are set forth in the appealed order. The track through the City of Greenwood was crisscrossed by highway crossings. This created a dangerous situation which was addressed by an Act of the U. S. Congress entitled, "Demonstration Project for the Elimination

---

[2] *See* Sections 57-5-370 and 57-5-380, Code of Laws of South Carolina (1976) as amended in 1987, and note the 1987 amendment to Section 57-5-380 provides, "the condemnation does not impair the ability of the railroad—to operate."

[3] *See* Preamble to Act No. 173, Volume 2, Acts and Joint Resolutions, South Carolina (1987).

[4] This Section must be read in conjunction with Section 57-5-380 as amended in 1987. The concurring opinion overlooks this principle.

or Protection of Certain Public Ground-Level Rail-Highway Crossings in or in the Vicinity of Greenwood, South Carolina." By this Act, 90 percent of the money to accomplish the removal of the tracks and thereby the elimination of the crossings, was obtained.

Subsequently, several agreements were entered into by the City of Greenwood, Greenwood County, the State of South Carolina acting by and through the South Carolina Highway Department and Southern Railway which basically provided for the removal of the tracks from the center of the City of Greenwood to a new route outside of the City. The City obtained and conveyed to the railroad the property for the new route in exchange for all of the railroad's rights, title and interests in and to its easement or right-of-way in the center of the City, originally acquired pursuant to Act No. 2953 of 1845. The Highway Department, in coordination with the City of Greenwood and Greenwood County, then proceeded to implement a new highway system and traffic program along the old right-of-way through the City of Greenwood, and the old tracks were removed.

Because of the admittedly dangerous situation created by the crisscrossing of the railroad right-of-way by street crossings and the heavy traffic thereon and because the United States Government furnished the money for the City to acquire property outside of the City for a railroad right-of-way to be used in exchange for the railroad's right-of-way within the City, I would hold that conditions had clearly arisen which justified the conveyance in lieu of the condemnation to the City by the railroad of its right-of-way. And I would so hold. Accordingly, the City has rightfully obtained the right-of-way of the railroad easement by conveyance in lieu of condemnation as provided by Section 57-5-380 as amended; this being true, the plaintiffs in the case before us have no interest in the subject property; and I would so hold.

## II.

And I think that my brothers of the majority are in error with respect to Section 24 of Act No. 2953 of 1845. This section provides:

> XXIV. That the powers and privileges herein before granted, shall not be so construed as to prevent the

Legislature from making further grants of Ferries, Bridges, and Turnpike Roads, within any distance of the same whenever the convenience of the community may require such further grants.

The majority concedes that this section clearly grants to the legislature the right to use the right-of-way obtained by the railroad for a public highway; and with this there can be no question. My brothers of the majority then hold that no statute bestows "upon the department [the South Carolina Highway Department] the right to possess or occupy the right-of-way." I think my brothers of the majority are clearly mistaken about this because our Supreme Court takes a contra view in the case of *Riley v. South Carolina State Highway Department,* 238 S. C. 19, 118 S. E. (2d) 809 (1961); there our Supreme Court held:

The power of eminent domain is inherent in sovereignty. It is founded on the law of necessity. *Paris Mountain Water Co. v. City of Greenville,* 110 S. C. 36, 96 S. E. 545 [ (1918) ]. **It may be delegated by the State to its agencies.** *Smith v. City of Greenville,* 229 S. C. 252, 92 S. E. (2d) 639 [ (1956) ]. As pointed out in the *Paris Mountain Water Company* case, this power is more frequently committed by the State to its accredited agencies than it is exercised directly by the State.

The Highway Department was established "as an administrative agency of the State Government," Section 33-21 of the 1952 code. It derives its power from the Legislature. "It has no inherent power. Whatever power it attempts to exercise must be found in some Act." *Southern Railway Co. v. S. C. State Highway Department,* 237 S. C. 75, 115 S. E. (2d) 685, 688 [ (1960) ]. Among other functions vested in the Highway Department, it is empowered to build and maintain public highways and "acquire such lands and road building materials and rights of way as may be needed for roads and bridges by purchase, gift or condemnation." Section 33-71. It is further provided in Section 33-122: "The State Highway Department may acquire by gift, purchase, condemnation or otherwise any lands or other real estate that may be necessary, *in the judgment of the*

*Department,* for the construction, maintenance, *improvement or safe operation of highways in this State or any section of a State highway * * *."* It is stated in Section 33-127: *"The State Highway Department, for the purpose of acquiring property as authorized by Section 33-122, may condemn lands, rights of way and easements of railroad, railway, telegraph or other public service corporations."* [Emphasis mine.] [See footnoted correlation[5] of statutes]

\*     \*     \*     \*     \*     \*

In *State Highway Commission v. City of Elizabeth,* 102 N. J. Eq. 221, 140 A. 335, 338 [ (1928) ], the Court said in considering the extent of the power of eminent domain given the State Highway Commission, that it must be borne in mind that the Commission " 'is an *alter ego* of the state' itself" and "not a mere subordinate." It was held in *Elberton Southern Railroad Co. v. State Highway Department,* 211 Ga. 838, 89 S. E. (2d) 645, 648 [ (1955) ], that under a general power of condemnation, the Highway Department of Georgia could acquire **for public road purposes a part of a railroad right of way and in such a condemnation proceeding "the State, the sovereign itself, is acting by and through its * * * constituted agency, the State Highway Department."** [Emphasis mine.]

In addition to the above, the general assembly by Section 57-5-1640, Code of Laws of South Carolina (1976) provided, "the Department may—enter into lawful and appropriate agreements and contracts with railroad companies for— property rearrangement. . . ."

Taking all of the above together, together with the words of Section 24 of Act No. 2953 of 1845 it seems clear to me that the legislature has delegated to the Highway Depart-

---

[5] Section 33-22 of the 1952 Code is presently Section 57-3-10 and 57-3-20, Code of Laws of South Carolina (1976) as amended; Section 33-71 of the 1952 Code is Section 57-3-610(2), Code of Laws of South Carolina (1976) as amended; Section 33-122 of the 1952 Code is presently Section 57-5-320, Code of Laws of South Carolina (1976) as amended; Section 33-127 of the 1952 Code is presently Section 57-5-380, Code of Laws of South Carolina (1976) as amended.

ment the right to grant roads over the subject property because the convenience of the community of the City of Greenwood and the County of Greenwood requires such. In my mind no other meaning can be ascribed to Section 24 and the above statutes and Supreme Court authority when read together. And I would so hold.

### III.

I would affirm the appealed order on a further ground not expressed by the trial judge but appearing of record. Section 7 Act No. 43 of 1868 was later codified by Section 58-15-1310, Code of Laws of South Carolina (1976), which was repealed by Act No. 173 of the 1987 South Carolina Statutes at Large; this Act originally passed in 1868 provided, in effect, that when land was condemned by a railroad, it only obtained an easement as long as the property was used for a railroad and the title to the land remained in the owners. I believe that the repeal of this Act by Act No. 173 of the 1987 South Carolina Statutes at Large removes an erroneous concept of the nature of the title obtained by the railroad by Section 11 of Act No. 2953 of 1845.

The South Carolina Supreme Court cases on the law of this particular issue are conflicting. Where conflicting decisions appear to have been made by inadvertence or otherwise, and the position of the court is thereby rendered uncertain, the rule of *stare decisis* does not necessarily apply, and it is the duty of this court to follow the decision which it conceives is based upon the sounder reasoning, although, generally, the last expression of the court is controlling against prior opinions. *Coleman v. Page's Estate*, 202 S. C. 486, 25 S. E. (2d) 559 (1943). Such is the state of the law in the case before us.

In the case of *Lewis v. Wilmington & M.R. Co.*, 11 Rich. 91 (1857) the court interpreted language similar to that of Section 11 of Act No. 2953 of 1845 as meaning that the owner would be forever barred from recovering the land or compensation if he failed to act within the prescribed period. After the passage in 1868 of Section 7 of Act No. 43, later Section 58-15-1310, now repealed, it appears that the Supreme Court felt compelled to interpret Section 11 of Act No. 2953 of 1845 as vesting only an easement in the railroad

as long as it was used as a railroad. And so later cases[6] expressed a view contra to the view expressed in *Lewis*, which was decided before the 1868 Act limiting the title obtained by a railroad in condemnation proceedings to an easement. Now that Section 58-15-1310 has been repealed, it would seem to me that the courts should take a fresh look at the meaning of Section 11 of Act No. 2953 of 1845.

With the above in mind, I address the meaning of the statute. Act No. 2953 of 1845 provided by Section 9 thereof that the railroad could purchase fee simple title to the lands it needed in those cases where the owners of the land and the railroad agreed; by Section 10 thereof, the Act provided that when the parties could not agree, the railroad could acquire fee simple title to the property by way of condemnation.

Section 11 of the Act No. 2953 of 1845 provided:

XI. That in the absence of any written contract between the said Company and the owner or owners of land, through which the said Railroad may be constructed, in relation to said land, it shall be presumed that the land upon which the said Railroad may be constructed, together with one hundred feet on each side of the centre of said road, has been granted to the said Company by the owner or owners thereof, and the said Company shall have good right and title to the same, (and shall have, hold and enjoy the same) unto them and their successors, so long as the same may be used only for the purposes of the said road and no longer, unless the person or persons to whom any right or title to such lands, tenements, or heriditaments descend or come, shall prosecute the same within two years next after the construction of such part or portion of the said road as may be constructed upon the lands of the person or persons so having or acquiring such right to the title as aforesaid, and if any person or persons to whom any right or title to such lands, tenements or heriditaments belong or shall hereafter descend or come do not pros-

---

[6] E.g., *Ragsdale v. Southern Ry.*, 60 S. C. 381, 38 S. E. 609 (1901) and *Southern Ry. v. Beaudrot*, 63 S. C. 266, 41 S. E. 299 (1902).

ecute the same within two years next after the construction of the part of the said road upon the lands of the person or persons so having or acquiring such right or title as aforesaid, then he or they, and all claiming under him or them, shall be forever barred to recover the same: *Provided,* That nothing herein contained shall affect the right of feme coverts, infants or persons beyond seas, until two years after the removal of their respective disabilities.

I interpret the above Section as providing that where the owners refuse to sell and where the names of the owners were unknown to the railroad and therefore condemnation was not practical, the railroads could enter upon the property and commence construction on the land without being charged with trespass and that if the railroad so entered upon the property it would "be presumed that the subject land had been granted to the railroad by the owner or owners thereof so long as the railroad used it for purposes of the road." The Act then provided after the word "unless" that the owners had two years within which to seek compensation for the land so taken, in which event the railroad would have obtained fee simple title. And importantly, if the owners failed to seek compensation within two years, then **"the person or persons so having—such right of title and all claiming under him or them shall be forever barred to recover the same."** No other construction makes sense because the legislature said in no uncertain words that if the owners failed to seek compensation within two years, they would be forever barred from recovering title to the land. The land then belonged to the railroad unless it belonged to the state under Section 12 of the Act.

Section 12 of the Act provides that any lands which have not been theretofore granted by the state to any person would be vested in the railroad as long as it was used by the railroad. This section reminds us that in the 1845 title much of the land of this state was still vested in the state as successor to the seven proprietors.

In summary, the legislature in passing the 1845 Act envisioned four separate situations, which were:

1. Those situations in which the railroad was able to buy the property from individuals who owned it, which situations were covered by Section 10 of the Act.

2. Those situations in which the land was owned by individuals or legal entities which refused to sell to the railroad, in which case the legislature delegated to the railroad the right of condemnation and thereby the acquisition of fee simple title to the subject land; these situations are covered by Section 10 of the Act.

3. Those situations in which the owner of the land was either unknown or the land belonged to the state; these situations were covered by Section 11 of the Act.

4. Those situations in which the land was still owned by the state; these situations were covered by Section 12 of the Act.

I would hold that the legislature envisioned by Section 11 of the Act that when no owner of the land could be found, a presumption of grant from the state would be made to the railroad in order to avoid trespass actions but with the provision that if the owner did not apply for compensation by an inverse condemnation action, within two years, then the owners were forever barred from recovering title and consequently there would be no reversionary interest which could be triggered by an alleged abandonment of the railroad right-of-way.

I would for the above reasons hold that the ruling of *Lewis v. Wilmington & M.R. Co., supra,* is controlling in this case.

## CONCLUSION

I would hold for the reasons above set forth that (1) the subject land was acquired from the railroad in lieu of condemnation and therefore there is no reversion which might be triggered, (2) that Section 24 of the Act authorized the Highway Department, the City and County of Greenwood to use the land as a highway for motor vehicular traffic and (3) that the railroad owned a fee simple title to the subject property except that portion thereof which was titled in the State of South Carolina in 1845. For these reasons, I respectfully dissent to the majority opinion.